## DANIEL *et al.*, executors, *vs.* FROST.

1. Permissive possession of land without the payment of rent, having been enjoyed by a son-in-law for about twenty years, and, in the meantime, the father-in-law having made his will and devised the premises to the son-in law absolutely, clogging the devise with no condition, burden or duty whatsoever ; and the father in law, after resuming possession and holding it for a few months, having died without changing his will, the will, after probate, should be regarded as confirmatory of the implied or presumptive gift indicated by the long continued possession free of rent.

2. A creditor of the devisee, upon a contract made before the testator resumed possession, having attached the land some two years after probate of the will the devisee, (the defendant in attachment) could not defeat the levy by a disclaimer of the devise, made by deed executed after the levy took place ; nor could the executors defeat it by setting up their non-assent to the devise, there being, on the facts in evidence, no justification for withholding their assent, the land not being required for the payment of the testator's debts, or the expenses of administration.

3. Though to the ordinary issue in a claim case, to wit, that the property is subject, the plaintiff, superadded a specification of particular facts, such as that the property was devised, and that the executors, without good reason, withheld their assent, the evidence was not necessarily to be restricted to the particular facts alleged, but it might take as wide a range as if the ordinary issue had stood by itself.

4. General reputation of title is not admissible.

5. Slight errors in admitting or rejecting evidence, or immaterial errors in charging the jury, are not cause for a new trial, the verdict being in accordance with the law and the great controlling elements of fact.

6 With or without the suggestion of counsel, the court may recall the jury while they are in the act of retiring, and correct or explain any part of the charge which the court apprehends may not have been delivered with due accuracy or clearness to convey the meaning intended.

7. That the sheriff, whilst the jury were on a walk after being charged with the case, spoke to one of them in the presence and hearing of the others, respecting the health of a member of the sheriff's family, is not cause for setting aside the verdict.

8. That the sheriff selected and summoned the tales jurors necessary to complete the panel, he being plaintiff in a like case pending in the court against the same defendant and the same claimant, involving the same property, should have been urged as an objection

to the talesmen before the trial was begun. It comes too late after verdict.

9. In a claim case, a verdict finding the property subject need not specify why it is subject, whether there be one issue only or several issues.

10. Newly discovered evidence which could not change the result is of no consequence.

Gift. Wills. Debtor and creditor. Executors and administrators. Claim. Pleadings. Evidence. New trial. Charge of Court. Practice in the Superior Court. Jury. Sheriff. Verdict. Newly discovered evidence. Before Judge BUCHANAN. Heard Superior Court. September Term, 1878.

On January 6, 1877, an attachment in favor of Frost against Jones and wife, was levied upon lot 285 in the 12th district of Heard county. Daniel as executor of John Daniel, in behalf of himself and his co-executor, interposed a claim. At the March term, 1878, the plaintiff tendered an issue that the property levied on was subject. He also pleaded specially the following facts:

On August 18, 1868, testator made his will, by which the lot levied on was bequeathed to defendant Jones. Testator died on January 5th, 1875, and his will was admitted to probate at the following February term of the court of ordinary. Claimants, who are the executors, have capriciously withheld their assent to the devise aforesaid, although all debts of a higher dignity had been settled and the other legacies turned over before the levy. The executors have conspired with each other, and with the defendant Jones, to defeat said devise in order that it may not be made subject to the debts of the devisee. Wherefore plaintiff prays that said executors may be decreed to assent to said legacy, they having been qualified for more than two years before the levy; and that the property levied on be decreed to be subject to his debt.

The claimants joined in the issues thus set forth.

The evidence presented the following facts:

The defendant Jones married the daughter of testator about the year 1854 or 1855, and was then placed, with his wife, in possession of the lot of land in controversy. The testator allowed him and his wife all the rights and privileges of owners, but he retained the title in himself. He pursued this practice with each of his children. Plaintiff's debt was contracted when this was the condition of affairs, on December 17, 1873. In November, 1874, testator resumed possession, and shortly thereafter defendant and wife moved to Texas, where they have since resided. Testator often expressed it to be his intention to give this lot to Mrs. Jones free from the liabilities etc., of her husband, and it was supposed by some if not all parties for a long time after his death that this had been done. But Mrs. Jones having returned from Texas for the purpose of selling the land, a gentleman who was contemplating purchasing examined the will, when it was discovered that the devise was absolutely to her husband. Soon after this discovery this attachment was levied. The will was executed on August 18, 1868, and admitted to probate on February 1, 1875. The testator died on January 5th of the last named year.

On February 23, 1877, the defendant Jones, having, as he testifies, come to a knowledge of the terms of the will not until within that same month, executed an instrument under seal, in substance, as follows: Be it known that I, said Wm. J. Jones, having never assented to, accepted or ratified the bequest in item 6. of the will of John Daniel, and having never since his death exercised any control or authority over the lot therein devised, and it being my firm intention never to accept said devise, knowing that said lot was not intended by said testator for me, but that my name was by mistake or inadvertence inserted in said item, contrary to the known intentions of testator as expressed before and after the making of said will, I do, by these presents, for myself and heirs, absolutely renounce and disclaim any and all right, title or interest in said lot, and do hereby absolutely refuse to accept and ratify such bequest.

No reason was shown by the claimants why assent to devise was withheld.   The estate was perfectly solvent.

The jury found the land subject.   The claimants moved for a new trial upon the following, amongst other grounds:

1. Because the court charged the jury, that if they believed from the evidence that W. J. Jones took possession of the land in dispute in his own right, and held it adversely for the space of twenty years; if his possession was public, continuous, exclusive, uninterrupted, and peaceable, and accompanied with a claim of right, during the space of twenty years, they should find the property subject.   In this connection the court also charged §2680 of the Code, as to what constitutes actual possession.

2. Because after the court had fully charged the jury, on the request of counsel for plaintiff, it called them back and said: "Brother Cox (counsel for plaintiff) is afraid you misunderstood the latter part of the charge.   If you believe the title to the land was in W. J. Jones at the time of the levy of the attachment, you should find the property subject.   If you believe the title to the land was not in W. J. Jones at the time of the levy of the attachment, you should find the property not subject."

3. Because the court refused to direct the jury, after the verdict was read, to state therein on what issue they found the property subject, plaintiff having claimed to have shown title in the defendant as follows: (1). By the will of John Daniel.   (2). By adverse possession for 20 years.   (3). By parol gift and valuable improvements.   (4). By seven years exclusive possession of a child without payment of rent.

4. Because the court permitted the plaintiff, over the objection of claimants' counsel, to introduce evidence of title in W. J. Jones by prescription, as stated in the preceding ground, without first pleading the same in his issue.

5. Because the sheriff, who is the plaintiff in a similar case against the same land, conversed with the jury after they retired to make up their verdict, he having, also, as sheriff, selected three persons to fill up the panel of trav-

Daniel *et al.*, executors, *vs.* Frost.

erse jurors drawn by the court, one of them being on the jury which tried the case, and having also participated with the plaintiff and his counsel in selecting the jury.

6. Because the court excluded the testimony of Glover to the effect " that it was his understanding all the time that the land belonged to old man Daniel, and he put W. J. Jones on it to make a living," the witness stating that he did not know from whom he derived such understanding.

7. Because one of the jurors being stricken for cause, and plaintiff insisting on a full panel, the said sheriff, by direction of the court, summoned a juror to take his place, who was placed on the panel from which the jury trying the case was stricken, claimants' counsel not knowing at the time that said sheriff would participate with plaintiff in striking the jury, or that he had made an agreement with plaintiff that he would use all his influence to assist him in gaining the case.

8. Because of the newly-discovered evidence of Littleton Pascal.

The affidavits submitted in support of the 5th and 7th grounds showed that the talesmen were selected by the sheriff in the ordinary discharge of his duty, without reference to any case; that he did not assist in striking the jury, and that there was no agreement between the sheriff and the plaintiff as to the former's assisting him to a successful issue of the trial. That the only conversation between the sheriff and the jury resulted thus: The sheriff had not been to his home during the week. One of the jurors in going to and from home each night and morning, passed his house. This juror, in the presence of the others and the bailiff, as they were going from the court-house for a walk, called out to him publicly that his son Dick was sick. The sheriff inquired how he was, when the juror responded that he was " better this morning."

The affidavit of Paschal in support of the last ground, was to the same import as all the evidence of the claimants,

showing that Jones, whilst in possession of the land in controversy, did not regard it as his own.

The motion was overruled, and claimants excepted.

L. R. RAY; W. H. DANIEL; B. H. BIGHAM; L. H. FEATHERSTON, for plaintiffs in error, argued as follows:

Disclaimer defeated devise, Bouv. L. Dic., "Bequest;" Code, §§2657, 2658; Cruise's Dig., vol. 4, title 32, chap. 26, §1; *Ib.*, p. 337, §5, 345, §1; 3 Barn. & Ald., 31; 6 Cow., 617; 20 John., 184; 12 *Ib.*, 420; 21 *Ga.*, 257; 17 *Ib.*, 267; Hill on Trust., 224; Code, §§3162, 3164, 2465; 20 *Ga.*, 480; 5 *Ib.*, 341; 1 *Ib.*, 501; 55 *Ib.*, 353; 48 *Ib.*, 596; 51 *Ib.*, 147; 14 *Ib.*, 362. Pleadings requisite in claim cases, 54 *Ga.*, 620, 624; 57 *Ib.*, 416. Adverse possession, Code, §2679; 10 *Ga.*, 408; 17 *Ib.*, 558. Prescription of twenty years; that length of time has not passed since enactment of law. It first became law in 1767; was repealed in 1805; revived again June 26 and December 8, 1806, see Prince's Dig., 315; repealed again January 22, 1852; 15 *Ga.*, 549; acts of 1855-6, 233; 38 *Ga.*, 439; 28 *Ib.*, 130. Verdict should specify on what issue found, Code, §3560; 58 *Ga.*, 417. Conversation of sheriff with juror, 44 *Ga.*, 200; 43 *Ib.*, 20, 140; 42 *Ib.*, 64; *Smith vs. Lovejoy*, decided March 11, 1879.

T. H. WHITAKER; A. H. COX, for defendant, cited, on adverse possession, Code, §2682; 1 Gr'lf Ev., 17; 1 Bouv. L. Dic., "Adverse Possession;" *Ib.*, "Prescription;" 30 *Ga.*, 896; 43 *Ib.*, 352; 38 *Ib.*, 439; 48 *Ib.*, 334; 4 Wheat., 207; 1 Kent, 455; 34 *Ga.*, 354; 7 *Ib.*, 3. On disclaimer, Code, §1947; 19 *Ga.*, 288. On verdict, 57 *Ga.*, 47; 52 *Ib.*, 543; 49 *Ib.*, 283. On competency of jurors, 60 *Ga.*, 520. On newly-discovered evidence, 41 *Ga.*, 426.

BLECKLEY, Justice.

The evidence in the record conducts, partly by direct statement, and partly by reasonable inference, to the follow-

ing conclusions of fact : That on the marriage of Jones and wife in the year 1854 or 1855, most probably in the former, John Daniel, her father, purchased the land now in dispute for his daughter as a marriage portion, removed them to it, and settled them upon it ; that from that time until Jones and family removed to Texas in November, 1874, Jones was in continuous, unbroken possession, the first one or two years holding in person, and afterwards by his tenants, and during the whole period received and enjoyed the rents and profits ; that while thus in possession he erected upon · the premises a gin-house and screw, cleared much of the land, and fenced a large portion of it ; that he was or became a prosperous farmer, had one or more other plantations, contracted debts, fell into reverses, and in 1873 became insolvent ; that it was Daniel's custom, when his children left him, to provide them with land, retaining the title in himself, but permitting them to use and enjoy free of rent ; that in the cases of several sons and one daughter, to whom he had supplied land in this way, he devised the land to them by his last will ; that Jones, though using and in general treating the land as his own, and. sometimes speaking of it as his, did not claim it independently of, or adversely to Daniel, but often expressly recognized the fact that Daniel had retained and still had the title ; that on removing to Texas in 1874, he reluctantly surrendered possession to Daniel, the latter requiring it ; and that the debt on which the attachment is founded was contracted before the change of possession. Jones was a witness for the claimants, and testified, amongst other things, that Daniel gave the land to Mrs. Jones when she was married, retaining the paper title to prevent the property from being squandered. He also testified that learning from Daniel (when does not appear) that he intended a separate estate in Mrs. Jones, he, Jones, for many years before he left Georgia, returned the property for taxes in her name ; leaving room for the inference that he had previously returned it in his own. He further testified that shortly before he removed to Texas, Daniel

interdicted any sale of the land, and said he, Jones, should never have the power to sell it or to spend the proceeds, but that it should remain for the use of Mrs. Jones. The will of Daniel was executed in 1868, and its sixth item is in these brief and plain terms: "I will and bequeath unto my son-in-law Wm. J. Jones, lot of land No. 285, in the 12th district of originally Troup, now said county of Heard." There is no other mention of Jones, and no mention at all of his wife, in this instrument, save that there is a general residuary clause in favor of all the testator's children as a class, and the evidence discloses that they were nine in number.

1. If we regard the land as given to Mrs. Jones on her marriage (and Jones testifies that it was), with no express creation of a separate estate, the law as it then stood, and as it remained up to 1866, carried the ownership through her into her husband. The two were put into possession together, which actual occupancy lasted for a year or two, and afterwards he held by his tenants, receiving all the rents and profits. There is no indication in the evidence that he received these as trustee or agent for his wife, and not as husband, or that they went to her use and not to his own. For nearly or quite twenty years, his possession and enjoyment continued. It is true the paper title was retained by the donor, and Jones always recognized that fact, never repudiating him as lord paramount, in speaking of the title to others, but freely admitting that he had retained the title, and still held it. It is true, also, that when removal to Texas was about to take place, Daniel required the possession to be restored, and that Jones, without objection, but with considerable show of reluctance, yielded, he as well as his wife bursting into tears, and saying it was "mighty bad." This resumption of possession is the only *act* on the part of Daniel out of harmony with the theory of a substantial gift in the beginning. The mere retention of the formal title is not uncommon. When parents give land to their children they frequently take their own time

to convey, sometimes doing it by deed, sometimes by will, and, in here and there an instance, delaying it until death surprises them and it is too late to convey at all. In this case, however, Daniel, when he resumed possession, had already executed the conveyance six years previously, and it was only awaiting his death to become effective. Two years before the will was made, the law had been changed so that property afterwards vesting in the wife would not pass to the husband; insolvency had overtaken Jones the year before the possession was resumed, and five years after the will was made, and Daniel, as the evidence shows, knew it; still, he left the will as it was, and died without altering its provisions. Are not these facts sufficient to qualify and explain the resumption of possession, and to show that he intended the gift to stand, and the will to pass title in confirmation of it? There is no evidence that he acted at any time under a mistake of law, or in ignorance of the law. The presumption is that he knew a gift to the wife was a gift to the husband when he gave this land to his daughter and put her and her husband in possession; and it is also to be presumed that he knew of the change which the law had undergone before the execution of his will. The answer to all his mere declarations, granting that he made them, is the will. That is an act, and the most solemn act of his life, and according to it, his intention was for Jones to have the land—not Mrs. Jones or anybody else. That he made no attempt to withhold or divert the formal title from Jones (the real owner) after learning of the latter's insolvency, is a bright and lasting honor to his memory. He knew that Jones had obtained credit while in possession, and while enjoying the property ostensibly as his own; that the possession had been exclusive and long continued; that its natural effect, under the circumstances, was to serve as a basis of credit, and excite the expectation of creditors; he weighed these considerations, doubtless, as an honest man, and concluded to live and die by the will as it was. Such an exhibition of old-time con-

scientiousness is refreshing.    Virtue, in all the offices of life, must take its orders from duty, not from happiness.    Happiness is not the mistress of the moral household, but the favorite daughter.    Though the most cherished, she is not the most discreet member of the family.    She is to be checked and restrained, and not have her own way.    With too much indulgence, or too much present gratification, she becomes a spoiled child, and degenerates into misery.

We have seen the result of following out the testimony of Jones that there was an express gift to his wife.    A like result will ensue if we disregard that testimony, and confine our view to an implied or presumptive gift, as shadowed forth by the relationship of the parties, the circumstances under which the possession and use commenced, and the long period during which they continued.    In either event the will ought, in this litigation, to be regarded as confirmatory of the gift.

2. Under the foregoing circumstances, what was the effect of the written disclaimer executed by Jones two years after the will was probated, and a month after the land was seized as his property by virtue of the attachment?    Authorities on the disclaimer of legacies and devises are abundant. Many are referred to in Viner's Abridgement, in Bacon's Abridgement, in Comyn's Digest, and elsewhere.    A very full case on the subject is to be found in 1 Rob. (Va.), 94; and cases more or less instructive are reported in 4 Metc., 584; 23 Me., 269; 2 Story, 327; 6 B. & C., 112, and 2 Bing., (N. C.), 70.    The rule is plain and uniform, that, in general, a disclaimer made and promulgated in proper time and manner prevents the intended estate from vesting; the reason for which is, that no man will be constrained to accept property or an interest in property contrary to his own election and consent.    Riches are not to be forced on people —whether they will or not.    Property is a burden as well as a benefit, and whoever is unwilling to bear the burden for the sake of the benefit, is at liberty to decline both. Numerous as are the authorities on the general subject, it

is not easy to find even one which treats of a disclaimer executed after the property has been seized under legal process at the instance of a creditor of the legatee or devisee, and whilst the matter of the legacy or devise is thus in *gremio legis*. The one nearest in point which we have been able to discover is 2 *Story*, 327, *supra ;* and the question is there only glanced at, neither fully discussed nor directly decided. The bearing, however, of the opinion so far as it goes, is towards some limitation upon the broad right of disclaimer, where the rights of third persons have attached or intervened. The law takes note of the acquisitive principle of human nature which impels men ordinarily to accept whatever of bounty is offered them. Code, §2658. A creditor is not over-rash in shaping his own action by a presumption which the law itself indulges. When he has so done, can the donee, his debtor, step in and by mere whim or caprice defeat him ? If there is a substantial reason for the donee's conduct, other than the unworthy object of baffling his creditor, as, for instance, where the legacy or devise is coupled with a duty or obligation not incident to the bare absolute ownership of property, a disclaimer ought to, and doubtless would, prevail; but if it is clear that the donee, supposing him to be possessed of the average traits of humanity, would accept for himself were he unobstructed and unprovoked by his creditor, and that he is moved to disclaim by mere perverseness or passion, it would seem that the law ought to overrule his election, to the extent of the inchoate or *prima facie* lien which has been acquired by means of the legal seizure. Let him renounce if he will what the incumbrance may not absorb ; but can he divest the incumbrance altogether by his renunciation ? On the other hand, however, a candid mind must admit that freedom of election, such as the general doctrine of disclaimer seems to imply, would be much more restricted than what we term mental freedom, or freedom of will, ordinarily is, if we cut off the election from whim and caprice, and from the unworthy passions and motives from which a great part

of human conduct, in this imperfect world, proceeds. To do as one pleases, even when he pleases, in his own business, to act absurdly or from low impulses, is a very precious right. The right, especially, to harry and bedevil one's creditor is inestimable! From the narrower point of view of strict law, it may be said, also, that disclaimer does not simply divest the intended estate, but goes back and hinders any complete vesting of it; that the creditor, when he seizes or levies, fastens upon an inchoate, imperfect interest of his debtor; that this interest does not grow or increase because in *gremio legis*, but after seizure is just what it was before; and that, hence, it follows that the seizure does not put the interest beyond the reach of a disclaimer. A creditor, it may be urged, is entitled to obtain satisfaction out of what his debtor owns, but not out of what the debtor expressly refuses to own. These difficulties in the way of a creditor who has only the bequest or devise to back his levy, where he is met by a disclaimer otherwise sufficient to defeat his debtor's interest, are, it must be admitted, formidable. In this case, as we have already seen under the preceding head, the creditor has a substantial gift to his debtor *inter vivos*, on which the devise itself was founded; and he has, moreover, the equitable fact that he extended the credit whilst the debtor was in possession of the premises as apparent owner! The actual case has all this concreteness—all this rich meat in it. The long holding of Jones was subordinate to all the rights which Daniel retained, but when Daniel was satisfied for him to have the land as full and complete owner, who else had a right to object or complain? It seems beyond all doubt that if Jones were disposed to claim the land by reason of the gift, or of his marital relation at the time of the gift, his protracted possession and the will, all put together, his claim would be irresistible; and shall a creditor who became such pending that possession stand on a lower footing because Jones prefers to baffle him in favor of Daniel's residuary legatees or heirs at law? The Code says, (section 1945), "The rights of creditors shall be

favored by the courts, and every remedy and facility afforded them to detect, defeat and annul any effort to defraud them of their just rights." With the last possible objection of Daniel removed out of the way, is it not just and honest that this land shall be devoted to the payment of a debt which Jones contracted whilst he held it as ostensible owner? and shall he, by co-operating with the executors, he working by disclaimer and they by claim, be permitted to defeat this righteous result? The executors have had full time to administer, and had full time before the levy was made. They had paid all the debts except some trifles, and had executed the will as to all bequests and devises except this to Jones. The property which it embraces is not needed to meet either debts or the expenses of administration. Why then should they withhold their assent to the devise? Why, in view of the lapse of time and the condition of the estate, shall their assent not be presumed? Or, under the equitable pleadings in this case, why, if necessary, might not their assent be coerced by decree?

3–10. The substance of the entire case, on its real merits, is exhausted in the foregoing paragraphs. The rulings of the court on the points of practice raised, and on other small matters, may be collected from the head-notes. We do not mean to pronounce the charge of the court completely accurate, or to say that there was no error whatever in admitting or rejecting evidence. What we do decide is, that there was no material error, and that the verdict was correct. The motion for a new trial was properly overruled.

Judgment affirmed.