In the Matter of the Accounting of FREDERICK W. MULLER, as Administrator C. T. A. of RULEMAN E. MULLER, Deceased.

Surrogate's Court, Kings County, April 20, 1951.

*William H. Amend* for administrator *c. t. a.*, petitioner.

*J. Vincent Keogh, United States Attorney for the Eastern District of New York (Jeremiah J. Sullivan* and *Francis X. McGlynn* of counsel), and *David L. Bazelon, Harold I. Baynton* and *David Moses* for J. Howard McGrath, Attorney General of the United States, as successor to the Alien Property Custodian.

RUBENSTEIN, S. The administrator *c. t. a.* has filed his account with a petition for its judicial settlement wherein he prays for a determination of the validity of the renunciations of their legacies executed by certain legatees. The Attorney General of the United States, as successor to the Alien Property Custodian, has appeared and filed an answer asserting that the purported renunciations are void and ineffectual and by reason of his vesting order he is entitled to the legacies bequeathed to such legatees by the testator. Thereafter, the Attorney General made a motion to strike from the records the purported renunciations.

Testator died February 12, 1946. His will was admitted to probate. Therein he made bequests to three nationals of Germany, resident in Bremen. On January 26, 1949, the Attor-

ney General of the United States, acting under the authority of the Trading with the Enemy Act (U. S. Code, tit. 50, Appendix, § 1 *et seq.*) as amended, and the executive orders and regulations issued thereunder, vested in himself " all right, title, interest and claim of any kind or character whatsoever " of these aliens. On July 27, 1949, a document was recorded in this court by which, it is claimed, these three enemy aliens, a friend and two sisters of the testator, renounced their legacies and, in addition, the two sisters renounced their rights to intestate inheritance.

In support of his motion to strike this instrument from the record, the Attorney General insists, *inter alia,* that the military laws in effect in Germany prevent the court from according recognition thereto.

It is undisputed that these alien enemies are resident of a part of Germany occupied by the armed forces of the United States, and are under the control of the Military Government. The power exercised over them is that of the Executive Department of the United States, which in all its constitutional acts of power has " as much legal validity and obligation as if they proceeded from the legislature ". (The Federalist, No. 64; *United States* v. *Pink,* 315 U. S. 203, 230.)

Acting as the representative of the Executive, on July 14, 1945, the Commanding General of the United States Armed Forces in Europe issued, in the United States area of control, his Proclamation No. 1, addressed " To the People of Germany ", which read in part: " All persons in such Government Zone will obey immediately and without question all of the enactments and orders continued in effect or issued by me or under my authority." (Code of Fed. Reg. [1947 Supp.], tit. 10, Army, § 3.3a, p. 1905; see, also, *Rex* v. *Bottrill* [1947], 1 K. B. 41.) On January 21, 1947, there was promulgated under the authority of the Military Government, Law No. 53 (Code of Fed. Reg. [1947 Supp.], pp. 1937–1939) excerpts from which are rearranged and set out in part:

(a) *Article I; prohibited transactions.* (1) Except as duly licensed by or on instructions of Military Government, any transaction involving or with respect to any of the following is prohibited: (i) Any foreign exchange assets owned or controlled, directly or indirectly, in whole or in part, by any person in Germany; * * *

(4) " Foreign Exchange Asset " shall be deemed to include: (i) Any property located outside Germany. * * * (6) Property shall be deemed to be " owned " or " controlled " by any person * * * if such person has a right or obligation to purchase, receive or acquire such property; * * *

(3) " Property " shall mean all movable and immovable property and all rights

and interests in or claims to such property whether present or future, and shall include, but shall not be limited to, land and building, money, stocks, shares, patent rights or licenses thereunder, or other evidences of ownership, and bonds, bank balances, claims, obligations and other evidences of indebtedness, and works of art and other cultural materials; * * * (2) " Transaction " shall mean acquiring, importing, borrowing or receiving with or without consideration; remitting, selling, leasing, transferring, removing, exporting, hypothecating, pledging or otherwise disposing of; paying, repaying, lending, guaranteeing or otherwise dealing in any property mentioned in this section. * * * (e) *Article V; void transactions.* Any transfer effected in violation of this section and any agreement or arrangement made, whether ·before or after effective date of this section, with intent to defeat or evade Law No. 53, or the objects of Military Government, is null and void.

Military Government Law No. 53 is in accord with the policy expressed in the directive dated July 11, 1947, sent to General Clay, then Commanding General, by the Joint Chiefs of Staff, after approval by the State, War and Navy Departments, which, it was therein said, constituted a statement of the objectives of the Government of the United States in Germany. Following is an excerpt from Department of State Bulletin (Vol. XVII, No. 421, July 27, 1947, p. 192) :

" 21d. Pending agreement among the occupying powers, you * * * will continue to ensure that all property, however owned, * * * in your zone are subject in all respects to the decisions and directives of the Control Council, and to Military Government and German Law."

Petitioner's position, in opposition to that of the Attorney General, is that the latter cannot force these enemy aliens to accept legacies or an intestate share against their will, or, as it has been said, a man " cannot have an estate put into him in spite of his teeth." (*Thomson* v. *Leach,* 2 Vent. 198, 206.) Therefore, he argues, the aliens having declined, there is no interest which the Attorney General can successfully vest. In support of his position he relies on *Albany Hosp.* v. *Albany Guardian Soc.* (214 N. Y. 435) and cases of similar import which, he contends, are authority for the proposition that a legacy, devise or intestate share is at best an offer which cannot be forced upon a person. Without passing on petitioner's interpretation of these cases, this court is compelled to give effect to Military Government Law No. 53.

Except as duly licensed by that law, these enemy aliens were prohibited from " disposing of " " any property outside Germany " " if such person has a *right* or obligation to purchase, *receive,* or *acquire* such property." (Emphasis supplied.) It cannot be denied that prior to an effective renunciation there

was a right to receive or acquire the property bequeathed; that such right was personal property (*Matter of Wilson,* 298 N. Y. 398, 404) and that these aliens could not rid themselves of their legacies except by their own *affirmative* act (*Matter of Wilson, supra,* p. 403). The instrument under consideration is an attempt " to dispose " of their rights. Thus it falls under the interdiction of both the language and the spirit of Law No. 53. To hold otherwise is to lose sight of reality.

The court is here concerned more with the substance of the opportunity offered to these legatees than it is with " classifying legal concepts and tagging them with names and labels." (Cf. *Freuler* v. *Helvering,* 291 U. S. 35, dissenting opinion by CARDOZO, J., p. 49.) Were it not for the inhibiting will of the United States, the right of these enemies to receive these legacies would be subject to their unfettered command and they would be free to enjoy them at their option. (Cf. *Corliss* v. *Bowers,* 281 U. S. 376, HOLMES, J.) But they may not rid themselves of these rights for they are forbidden so to do without a license.

The court is required to give effect to the command of the Military Government. To do otherwise might at some time permit funds to be diverted into the hands of someone not wholly in sympathy with the objectives of the United States. While in this case there is not the slightest suggestion of collusion, the possibility of its arising once a precedent is established and the inherent difficulty of proving covert acts, recommend the adoption of a rule which gives full effect to the Military Government laws.

Not only is the court required to give effect to this law by choice, it is also of the opinion that it is compelled to recognize the law as binding on the court as an expression of the dominant policy of the United States. While the United States by reason of its nonannexation of the territory occupied by the achievement of its arms may not be the true sovereign of that territory (see Oppenheim, The Legal Relations between an Occupying Power and the Inhabitants, 33 L. Q. Rev. 363) nevertheless, it assumed supreme authority over the people in the territory occupied. (3 Hyde on International Law [2d rev. ed.], pp. 1878–1879; 1 Hackworth, Digest of International Law, p. 156.) As such supreme authority it " decides what acts shall or shall not be done, within its dominion." (Higgins' Hall on International Law [8th ed.], p. 56; 7 Moore, Digest of International Law [1906], pp. 257–258.) As it was said " Where the King of *England* conquers a country, it is a different consideration:

for there the conquerer, by saving the lives of the people conquered, gains a right and property in such people; in consequence of which he may impose upon them what laws he pleases." (2 *P. Wms.* 75 [1722].) It has also been said that alien enemies have such rights, and such rights only, as were theirs at common law. (*Techt* v. *Hughes,* 229 N. Y. 222.) Thus, there can be no question the Military Government had the power to forbid the juristic act here attempted. The authority which expressed the public policy of the United States was the same authority to which these enemy aliens owed the duty of obedience.

Since State laws and policies must yield before the external power of the United States (*United States* v. *Pink, supra,* p. 232) the courts of this State will do nothing which would tend to hamper the full effectuation of that power or tend to render it nugatory. (*Clafin* v. *Houseman,* 93 U. S. 130; *Testa* v. *Katt,* 330 U. S. 386; *Teeval Co.* v. *Stern,* 301 N. Y. 346.) Recognition of this instrument, trivial though it may be of itself, would be giving effect to a jural act tending to diminish the prestige of the Military Government and nullify its announced policy. As it has been said in another context, " We should do nothing to thwart the policy which the United States has adopted." (*Russian Republic* v. *Cibrario,* 235 N. Y. 255, 263.)

Much emphasis is placed upon *Matter of Herter* (193 Misc. 602, affd. 274 App. Div. 979, affd. 300 N. Y. 532) and upon *Stoehr* v. *Miller* (296 F. 414). *Matter of Herter* merely held that the right to elect under section 18 of the Decedent Estate Law was purely personal to the surviving spouse and that the Attorney General, acting in hostility to the rights of the widow, may not exercise the right granted by our statute. Nothing else was there decided. In the *Stoehr* case, it nowhere appears that the renouncing enemy alien was at the time of the renunciation subject to or prohibited by our occupying forces from executing the instrument there held effective.

It is unnecessary to consider whether in the instant case the seizure by the Attorney General may be sustained upon any theory of " rights or new considerations intervening the probate of the will and the refusal of acceptance by the devisee " or legatee. (*Albany Hosp.* v. *Albany Guardian Soc., supra,* p. 443; *Matter of Wilson, supra,* majority opinion, p. 402, minority opinion, p. 408.)

As a jural act, the instrument filed may not be availed of to produce the result desired; as a matter of evidence it is not such

an " effective renunciation " as will overcome the presumption of acceptance. (*Matter of Wilson, supra,* dissenting opinion, p. 407.)

It is enough in this case to say that these enemy aliens had a property right in the legacies and that there is no effective renunciation of those legacies before this court.

The court accordingly determines that the purported renunciations of legacies are void and ineffectual, the motion to strike them from the record is granted and the legacies bequeathed to such legatees are payable to the Attorney General, as successor to the Alien Property Custodian, under the vesting order issued by him.

Proceed accordingly.